**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SENECA NATION OF INDIANS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )     Civil Action No. 12-1494 (RMC) |
| | ) |
| | ) |
| UNITED STATES DEPARTMENT OF | ) |
| HEALTH AND HUMAN SERVICES, *et* | ) |
| *al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## OPINION

The Seneca Nation of Indians administers its own healthcare system through a self-determination contract with the Indian Health Service under the Indian Self-Determination and Education Assistance Act.  The Nation submitted a contract amendment to the Indian Health Service to adjust the number of persons to be serviced under the contract and, as a result, to increase the funding provided to the Nation for fiscal years 2010 and 2011.  IHS did not respond to the proposal within the 90 days as required by statute, and the Nation contends that its proposed amendment automatically became part of its contract with IHS upon the lack of a timely response.  The Secretary of the Department of Health and Human Services, of which IHS is a constituent part, disagrees.  The parties have briefed cross-motions for summary judgment, and the matter is ripe for decision.  For the reasons set forth below, the Nation's motion for summary judgment will be granted.

## I.  FACTS

The facts here are substantially undisputed, and the parties' dispute focuses almost exclusively on the legal effect to be ascribed to a single letter sent by the Nation to IHS.

1

The Nation, which is based in Salamanca, New York, is an Indian tribal government recognized by the federal government.  The Defendants are the Department of Health and Human Services ("HHS") and its Secretary, Kathleen Sebelius, sued in her official capacity; they are referred to in this Opinion collectively as "the Secretary."  The Indian Health Service ("IHS") is an "HHS component whose principal mission is to provide primary health care for American Indians and Alaska Natives throughout the United States."  Defs.' Cross-Mot. Summ. J. ("Defs. MSJ") [Dkt. 15] at 1 (citations omitted).

Under the Indian Self-Determination and Education Assistance Act ("ISDEAA"), Pub. L. 63-638, 88 Stat. 2203 (1975), *codified as amended at* 25 U.S.C. § 450 *et seq.*, the Nation entered into a self-determination contract with IHS in 2000 so that the Nation could administer its own healthcare programs.  *See* Self-Determination Contract ("Contract") & 2010 Annual Funding Agreement ("2010 AFA"), Pl. MSJ, Ex. A [Dkt. 14-4].  The Contract was executed on September 20, 1999 by Duane James Ray on behalf of the Nation and on January 3, 2000 by Ralph W. Ketcher, Jr., on behalf of IHS; it went into effect on January 1, 2000.  Contract at 13. The Contract has an "indefinite" term, "subject to the annual appropriation of funds by the Congress," with a "funding period . . . [to] be determined on the basis of a calendar year" or other period as the parties agree.  *Id.* at 2.  It provides that "[t]he total amount of funds to be paid under this Contract, pursuant to Section 106(a) of the Act [25 U.S.C. § 450j-1(a)], shall be determined in an Annual Funding Agreement ["AFA"] entered into between the Secretary and the Contractor, which shall be incorporated into this Contract."  Contract at 7.  For every fiscal year since the Contract was signed, the Nation and IHS have signed a new AFA.[1]

---

[1] The parties agreed to funding periods based on calendar year (i.e., January 1 to December 31) for 2000, 2001, 2002, and 2003.  Beginning on October 1, 2004, the parties switched to a fiscal

Two provisions of the Contract are worth emphasizing. First, the Contract provides:

> It is the intent of the Tribe to establish this Contract with the Secretary as a "mature contract" . . . . Each provision of the [ISDEAA] and each provision of this Contract shall be liberally construed for the benefit of the Contractor to transfer the funding and the following related functions, services, activities and programs (or portions thereof), that are otherwise contractible under Section 102(a) of the Act, including all related administrative functions, from the Federal Government to the Contractor . . . .

Contract at 1. As to "Modifications and Amendments," the Contract states in Article V, Section 2:

> (A) IN GENERAL-Except as provided in Article V, Section 2(B) of this Contract, no modification to this Contract shall take effect unless such modification is made in the form of a written amendment to this Contract, and the Contractor and the Secretary provide written consent for modification.
>
> (B) EXCEPTION-The addition of supplemental funds for programs, services, functions and activities (or portions thereof) already included in the Annual Funding Agreement under Article VII, Section 2 of this Contract, or the reduction of funds pursuant to Section 106(b)(2) of the Act, shall not be subject to Article V, Section 2(A) above.

Contract at 9.

On October 26, 2009, the Nation's representative signed Modification # 71 and the 2010 AFA for the Contract, and Mr. Ketcher countersigned for IHS on November 12, 2009. *See* Modification # 71 and 2010 AFA [Dkt. 14-4] at 48–61.[2] Modification # 71 provides that it is "executed to incorporate the FY 2010 Annual Funding Agreement" for the Contract. For the

---

year (i.e., October 1 to September 30) funding period. *See* Modification # 71 and 2010 AFA [Dkt. 14-4] at 50.

[2] The page numbers for Modification # 71 and the 2010 AFA refer to the ECF page numbers.

funding period October 1, 2009 through September 30, 2010, the Contract Amount was

$8,686,927.00.  Modification # 71 at 50.  That amount, comprised of $7,803,211 for direct

program funds and $883,716 for indirect contract support costs, was to be paid to the Nation in a

lump sum.  2010 AFA at 53.  On March 7, 2011, IHS sent the Nation an executed copy of

Modification #82, which "extend[ed] the current FY 2010 Annual Funding Agreement until

9/30/2011."  Modification # 82, Pl. MSJ, Ex. B [Dkt. 14-5].

On April 29, 2011, the President of the Nation, Mr. Robert Odawi Porter, sent to

IHS a letter ("April 29, 2011 Letter") with the subject "User Population Undercounts and

Proposed Amendments," stating:

> I write on behalf of the Seneca Nation of Indians (the "Nation")
> with some urgency to appeal a recently discovered, substantial
> undercount of the Nation's active user population count and
> registrants by the Indian Health Service (the "IHS"). This
> undercount, in tum, has had a dramatic, negative impact on the
> Nation's allocation of federal funding. As you may know, over the
> past several years, staff of the Nation's Health Department have
> consistently submitted user population numbers that were much
> larger than what the IHS staff would ultimately conclude were our
> user population numbers for each year.
>
> The recent IHS report . . . reveals that more than 12,150 patient
> visits of Indians with mailing addresses from towns within our
> IHS-approved Contract Health Service Delivery Area ("CHSDA")
> in western New York state were not counted as visits to our
> Nation's health facilities because they were assigned instead to
> towns with the same names in Arizona, California, Colorado,
> Connecticut, Iowa, Louisiana, Maine, Massachusetts, Michigan,
> Minnesota, Montana, Nebraska, New Mexico, Pennsylvania, and
> South Carolina and thus not credited to active users within our
> CHDSA.
>
> Consequently, IHS mis-allocated more than a third of the 34,365
> patient visits to the Nation's two facilities, Cattaraugus Health
> Center and Allegany Health Center, from October 1, 2009 to
> September 30, 2010. . . .

As a result of this error, IHS has substantially undercounted the Nation's Active User Population. This had a measurable and costly effect on the IHS funds allocated to the Nation on the basis of Area and Headquarters tribal shares, as well as the funds otherwise allocated to the Nation on the basis of patient population share (e.g., diabetes; base funding). We estimate that a correction will require a proportional adjustment of our FY 2010 Active User Population total from 4,122 to 6,156, our FY 2010 Active Indian Registrants from 4,365 to 5,971, and our FY 2010 Total Indian Registrants from 4,365 to 7,713. In other words, our FY 2010 Active User Population was undercounted by 33% (4,122/6,156 = 66.95% or 2,034 patients).

We ask you to give your immediate attention to correcting these errors and that you please provide the Nation with the following information:

- Identify each of the years in which these errors resulted in an undercount, and by how much in each year.
- Identify each of the years in which the Nation's suggested numbers differed substantially from the IHS's final determination, and the steps taken by the IHS to determine the root cause of the discrepancies.
- Identify each of the years in which these errors resulted in lower funding allocations to Seneca Nation, and by how much funding by program and year.
- A date within the next month by which we can renegotiate the current FY 2011 funding allocations, based on the corrected Active User Population.
- Your proposal on how to locate and transfer funds to Seneca Nation in order to make Seneca Nation whole for the prior years in which this undercount was relied upon in fund allocations.

In the meantime, we ask that you agree to preserve any and all rights that the Nation has to appeal all funding allocations which were made in reliance upon the erroneously undercounted Active User Population and Registrants reports. By our initial calculation, we estimate that our claim for the FY 2010 agreement alone ranges from $2,866,686 (33% of budgeted amount of $8,686,927) to $6,801,696 (2,034 patients not counted times the IHS per capita funding per the IHS National Benchmark provided by Cliff Wiggins used in preparation for budget formulation a per patient IHS cost figure of $3,344), plus interest. This range is based upon the fact that our FY 2010 funding allocation was premised upon an Active User Population figure that was undercounted by

approximately 33% or 2,034 patients. Within this range is a claim for $3,774,392 (2,034 un-counted patients times $1,855.65) based on the per patient cost of $1,855.65 determined by IHS last Fall when IHS proposed to withdraw $380,000 from the Nation in response to the Nation's proposal to remove certain individuals from eligibility for services ($380,000 divided by 205 patients).[3]

Accordingly, pursuant to Pub. L. 93-638, as amended, we hereby propose an amendment to Seneca Nation's Contract # 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, for FY 2010 to increase Modification #71 by $3,774,392, plus interest, and request that this amendment proposal be handled pursuant to 25 CFR 900, Subpart D.

Likewise, pursuant to Pub. L. 93-638, as amended, we hereby propose an amendment to Seneca Nation's Contract # 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, extended for FY 2011 to increase Modification #81 by $3,774,392, plus interest, and request that this amendment proposal be handled pursuant to 25 CFR 900, Subpart D. Both claims in both amendment proposals are reasonable. . . .

April 29, 2011 Letter, Pl. MSJ, Ex. D [Dkt. 14-7]; *see also* Porter Aff., Pl. MSJ, Ex. C [Dkt. 14-6] ¶¶ 1, 7–8 (explaining undercount and methodology for requested amount).

The April 29, 2011 Letter was sent to Martha Ketcher, Area Director of the Nashville Area Office of the Indian Health Service, which is responsible for the Nation's IHS dealings, on May 3, 2011. *See* E-mail Chain, Pl. MSJ, Ex. D [Dkt. 14-7] at 6. Ms. Ketcher responded on May 4, 2011, writing: "We are in receipt of your letter and have made assignments to provide you with a response as soon as possible." *Id.*

---

[3] This is a reference to a dispute between the Nation and IHS in 2010, during which the Nation's Tribal Council adopted a resolution "directing [its] Health Department to follow an eligibility policy that would limit healthcare services to certain eligible IHS beneficiaries in violation of the Nation's ISEAA contract and AFA." IHS representatives informed the Nation of the potential violation, including the fact that "if the Nation intended to implement [the] resolution," the Nation would need to retrocede—that is, return to IHS—a portion of its funding. When the Nation asked IHS how it would calculate the reduced funding, Martha Ketcher, IHS's Area Director for the Nation, "shared five potential formulas, which relied on various commercial formulas, that could be used to calculate a per person value for healthcare." Among those formulas was one producing a per-patient cost of $1,855.65. Eventually, the Nation decided against implementing its resolution, so no retrocession occurred. *See* M. Ketcher Decl., Defs. MSJ Ex. [Dkt. 15-3] ¶¶ 10–17.

Radio silence then ensued.  IHS did not respond to the April 29, 2011 Letter, and the Secretary makes no claim that it did.  On August 30, 2011, counsel for the Nation sent Ms. Ketcher an additional letter, stating that "[t]he [ISDEAA] and the regulations require that any proposal to amend an existing contract be deemed approved by the Secretary if it is not lawfully declined within 90 days of its receipt or within an extension of that period consented to by the Nation.  The 90-day period has expired without lawful declination by the Secretary and the Nation has not consented to any extension of the 90-day period."  Aug. 30, 2011 Letter, Defs. MSJ, Ex. 2 [Dkt. 15-3] at 17–18.  The letter thus requested that IHS give effect to the proposals as amendments and increase the funding for the Nation.  *Id.*

IHS replied by letter dated September 27, 2011, stating, in relevant part:

> The FY 2010 and FY 2011 Contracts have already been awarded to the Nation. The Nation, however, disputes the amount of funds paid under the contracts. The proper method by which to dispute the amount paid under an awarded contract is by submitting a claim pursuant to the Contract Disputes Act (CDA). (*See* 25 C.F.R. §§ 900.215- 900.230.) The CDA and its implementing regulations govern "[a]ll HHS and DOI Self-Determination Contracts." 25 C.F.R. § 900.215(a)(l).  Claims submitted pursuant to the CDA include those post-award demands for "(1) Payment of a specific sum of money under the contract; (2) Adjustment or interpretation of contract terms; or (3) Any other claim relating to the contract." 25 C.F.R. § 900.218(a).  Because the Nation requests post-award payments of specific additional sums under the contracts, the claims described in the April 2011 Letter clearly fall within the scope of those post-award contract claims that must be submitted under the CDA.  IHS hereby determines that neither the April 2011 Letter nor the August 2011 Letter constitutes a proper claim under the CDA.

Sept. 27, 2011 Letter, Defs. MSJ, Ex. 3 [Dkt. 15-3] at 20–21.  Further, IHS wrote, because the Nation claimed an amount greater than $100,000 and had not certified the claim, its request was not a "proper claim" under the CDA, and would not be considered.  *Id.* at 21.

The Nation responded by letter dated November 30, 2011, reiterating the substance of its April 29, 2011 Letter and reasserting that the "ninety (90) day period expired without lawful declination by the Secretary."  Nov. 30, 2011 Letter, Pl. MSJ, Ex. D [Dkt. 14-8] at 2–6.  The Nation also re-styled its request for additional funds as a CDA claim and asked for IHS to treat it as such.  *Id.*

On December 21, 2011, IHS sent the Nation two identical letters—one for each fiscal year—acknowledging receipt of the November 30, 2011 Letter.  *See* Dec. 21, 2011 Letters, Pl. MSJ, Exs. F & G [Dkts. 14-9 &14-10].  Each letter stated: "The CDA requires that, within sixty days of receiving a claim for more than $100,000, IHS must either issue a decision on the claim or notify the contractor when it will issue the decision. . . . At this time, IHS has not had an opportunity to adequately review and make a final decision on your claim . . . IHS anticipates that it will issue a final contracting officer's decision by April 13, 2012."  *Id.*

By nearly identical letters dated April 5, 2012—again, one for each fiscal year at issue—IHS denied the Nation's claims.  *See* FY 2010 Claim Denial Letter, Pl. MSJ, Ex. H [Dkt. 14-11]; FY 2011 Claim Denial Letter, Pl. MSJ, Ex. I [Dkt. 14-12].  As to the FY 2010 claim, IHS reasoned:

> [T]he amount requested in the Nation's April 29 Letter was not added to its FY 2010 contract as a matter of law; IHS met its contractual responsibilities to the Nation in FY 2010; the Nation's user population miscount in FY 2010 was caused by the Tribe's own error; and the ISDEAA does not require that IHS pay the additional amount claimed[, and, e]ven if the user population figure had been corrected in FY 2010, the Nation would not have received any additional funds in FY 2010 considering the fact that 2010 user population was not a factor in any allocations made in FY 2010.

FY 2010 Claim Denial Letter at 4–8.

Similarly, as to the FY 2011 claim, IHS wrote:

> The amount requested in the Nation's April 29 Letter was not added to its FY 2011 contract as a matter of law; IHS met its contractual responsibilities to the Nation in FY 2011; the Nation's user population miscount in FY 2010 was caused by the Tribe's own error and was rectified during the course of FY 2011;[4] and the ISDEAA does not require that IHS pay the additional amount claimed[, and] even if the user population figure had been corrected in FY 2010, the Nation would not have received any additional funds in FY 2011.

FY 2011 Claim Denial Letter at 4–7.

On September 10, 2012, the Nation filed its lawsuit in this Court, challenging IHS's refusal to award the amendment and add funding to the FY 2010 and FY 2011 Agreements.  *See* Compl. [Dkt. 1].

## II.  LEGAL STANDARDS

### A.  Summary Judgment

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  Moreover, summary judgment is properly granted against a party who "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

---

[4] The FY 2011 Claim Denial Letter states that IHS, working with the Nation, "ultimately resolved" the technical error referenced in the April 29, 2011 Letter "in December 2011," resulting in a "final FY 2011 user population number" of "6,512," which was "more than the figure claimed by the [Nation]" in its April 29, 2011 Letter—i.e., 6,156 for FY 2010.  FY 2011 Claim Denial Letter at 5.

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson*, 477 U.S. at 255. A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position. *Id.* at 252. In addition, the nonmoving party may not rely solely on allegations or conclusory statements. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999). Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor. *Id.* at 675. If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (citations omitted).

## B. ISDEAA

The Secretary has "the burden of proof to establish by clearly demonstrating the validity of the grounds for declining [a] contract proposal (or portion thereof)." 25 U.S.C. § 450f(e)(1). The parties agree, *see* Defs. MSJ at 9, Pl. MSJ at 7–8, that this Court's review is *de novo*. *See Cheyenne River Sioux Tribe v. Kempthorne*, 496 F. Supp. 2d 1059, 1066–67 (D.S.D. 2007) (citing, *inter alia*, *Cherokee Nation of Okla. v. United States*, 190 F. Supp. 2d 1248, 1258 (E.D. Okla. 2001), *rev'd on other grounds by Cherokee Nation of Okla. v. Leavitt*, 543 U.S. 631 (2005)); *see also Shoshone-Bannock Tribes of the Fort Hall Reservation v. Shalala*, 988 F. Supp. 1306, 1318 (D. Or. 1997) (concluding that the ISDEAA's text and legislative history and the presumption favoring Indian rights favor *de novo* review).[5]

---

[5] Another court in this District applied the "arbitrary and capricious" standard of the APA to an ISDEAA claim. *See Citizen Potawatomi Nation v. Salazar*, 624 F. Supp. 2d 103, 107–09 (D.D.C. 2009). That court, observing that district courts "have disagreed on the appropriate standard to be applied," rejected the reasoning of *Cheyenne River* and followed three older, unpublished cases in applying the APA standard. *Id.* at 108 n.5. However, *Citizen Potawatomi Nation* is distinguishable from the instant matter on at least two bases. First, the Nation brings claims under only the ISDEAA, as opposed to both the ISDEAA and APA as in *Citizen*

### C.  Statutory Interpretation and Indian Law

In interpreting a statute, the general rule is that a court "must first determine whether the statutory text is plain and unambiguous."  *See Carcieri v. Salazar*, 555 U.S. 379, 387 (2009) (interpreting the Indian Reorganization Act, 25 U.S.C § 465) (citations omitted).  "In expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy."  *U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 455 (1993) (quoting *United States v. Heirs of Boisdore*, 49 U.S. (8 How.) 113, 122 (1849)).  The Supreme Court has clarified that canons of statutory construction are slightly different when courts consider laws governing relations between the United States and Indian nations.  "'[T]he canons of construction applicable in Indian law are rooted in the unique trust relationship between the United States and the Indians. . . . [S]tatutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit."  *Muscogee (Creek) Nation v. Hodel*, 851 F.2d 1439, 1444–45 (D.C. Cir. 1988) (quoting *Montana v. Blackfeet Tribe*, 471 U.S. 759, 766 (1985)); *see also Tunica-Biloxi Tribe of La. v. United States*, 577 F. Supp. 2d 382, 421 (D.D.C. 2008) ("The result, then, is that if the [statutory text] can reasonably be construed as the [t]ribe [or tribal organization] would have it construed, it *must* be construed that way." (quoting *Muscogee*, 851 F.2d at 1445; alterations in original)).

In seeking to give effect to the provisions of the ISDEAA, as with any statute, the Court must treat the "object and policy" of that statute as its polestar.  *See BlackLight Power, Inc. v. Rogan*, 295 F.3d 1269, 1273 (Fed. Cir. 2002) (internal quotation marks and citation omitted).  The Supreme Court has explicitly found that the ISDEAA "seeks greater tribal self-

---

*Potawatomi Nation*.  *Id.* at 109.  Second, the Secretary concedes that *de novo* review is appropriate.  *See* Defs. MSJ at 9.

reliance brought about through more 'effective and meaningful participation by the Indian people' in, and less 'Federal domination' of, 'programs for, and services to, Indians.'" *Cherokee Nation*, 543 U.S. at 639 (citations omitted).

This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and 25 U.S.C. § 450m-1(a) ("The United States district courts shall have original jurisdiction over any civil action or claim against the appropriate Secretary arising under this subchapter and . . . over any civil action or claim against the Secretary for money damages arising under contracts authorized by this subchapter.").  Venue is proper under 28 U.S.C. § 1391(e)(1).

### III.  ANALYSIS

### A.  Self-Determination Contracts Under the ISDEAA

In passing the ISDEAA in 1975, Congress found that "the prolonged Federal domination of Indian service programs ha[d] served to retard rather than enhance the progress of Indian people and their communities by depriving Indians of the full opportunity to develop leadership skills crucial to the realization of self-government, and ha[d] denied to the Indian people an effective voice in the planning and implementation of programs for the benefit of Indians which are responsive to the true needs of Indian communities."  25 U.S.C. § 450(a)(1). Those concerns remain today.  *See* Presidential Mem. on Tribal Consultation, 74 Fed. Reg. 57881, 57881 (Nov. 5, 2009) ("[F]ailure to include the voices of tribal officials in formulating policy affecting their communities has all too often led to undesirable and, at times, devastating and tragic results[, but] meaningful dialogue between Federal officials and tribal officials has greatly improved Federal policy toward Indian tribes.").

The ISDEAA provides that the "[t]he Secretary is directed, upon the request of any Indian tribe by tribal resolution, to enter into a self-determination contract or contracts with a tribal organization to plan, conduct, and administer programs or portions thereof," including

health services programs.  25 U.S.C. § 450f(a)(1).  All self-determination contracts must "contain, or incorporate by reference, the provisions of the model agreement" set forth in 25 U.S.C. § 450*l*(c) and must "contain such other provisions as are agreed to by the parties."  25 U.S.C. § 450*l*(a).  The model agreement included in the statute envisions, *inter alia*, a contract with a term of a specified number of years, with funding for specific years to be enacted through annual funding agreements.  *See id.* § 450*l*(c).

Because self-determination contracts essentially allow Indian tribes to step into the shoes of certain United States government agencies in providing certain services to their members, "[t]he amount of funds provided under the terms of self-determination contracts entered into pursuant to [the ISDEAA] shall not be less than the appropriate Secretary would have otherwise provided for the operation of the programs or portions thereof for the period covered by the contract."  *Id.* § 450j-1(a)(1).  This amount is called the "Secretarial amount" or "106(a) amount."  *Cherokee Nation*, 190 F. Supp. 2d at 149.  The ISDEAA sets the Secretarial amount as a floor; tribes are able to negotiate for higher levels of funding.  "On an annual basis, during such period as a tribe or tribal organization operates a Federal program, function, service, or activity pursuant to a contract entered into under this subchapter, the tribe or tribal organization shall have the option to negotiate with the Secretary the amount of funds that the tribe or tribal organization is entitled to receive under such contract pursuant to this paragraph."  25 U.S.C. § 450j-1(a)(3)(B).  While the Secretary may only reduce the amount of funds under § 450j-1(a) in the specific situations listed in § 450j-1(b), those funds "may, at the request of the tribal organization, be increased by the Secretary if necessary to carry out [the ISDEAA]."  *Id.* § 450j-1(b)(5).

The Secretary is not permitted to "revise or amend a self-determination contract with a tribal organization without the tribal organization's consent." *Id.* § 450m-1(b). "[A] tribal organization may submit a . . . proposal to amend or renew a self-determination contract[ ] to the Secretary for review." *Id.* § 450f(a)(1). The ISDEAA further provides:

> Subject to the provisions of [25 U.S.C § 450f(a)(4), governing severable portions of contract proposals], the Secretary shall, within ninety days after receipt of the proposal, approve the proposal and award the contract unless the Secretary provides written notification to the applicant that contains a specific finding that clearly demonstrates that, or that is supported by a controlling legal authority that—
>
> (A) the service to be rendered to the Indian beneficiaries of the particular program or function to be contracted will not be satisfactory;
>
> (B) adequate protection of trust resources is not assured;
>
> (C) the proposed project or function to be contracted for cannot be properly completed or maintained by the proposed contract;
>
> (D) the amount of funds proposed under the contract is in excess of the applicable funding level for the contract, as determined under [25 U.S.C.] § 450j-1(a); or
>
> (E) the program, function, service, or activity (or portion thereof) that is the subject of the proposal is beyond the scope of programs, functions, services, or activities covered under paragraph (1) because the proposal includes activities that cannot lawfully be carried out by the contractor.

*Id.* § 450f(a)(2). The 90-day period is subject to extension "if before the expiration of such period, the Secretary obtains the voluntary and express written consent of the tribe or tribal organization to extend or otherwise alter such period." *Id.* If the Secretary declines to enter into a contract proposal, she is required to, *inter alia*, provide written objections and assist the tribal organization in remedying deficiencies in the proposal. *Id.* § 450f(b).

The ISDEAA is implemented by regulations promulgated by the Secretary, collected in 25 C.F.R. Part 900.  Those regulations are automatically made part of all ISDEAA contracts.  25 C.F.R. § 900.2(c) ("Each contract, including grants and cooperative agreements in lieu of contracts awarded under section 9 of the Act, shall include by reference the provisions of this part, and any amendment thereto, and they are binding on the Secretary and the contractor except as otherwise specifically authorized by a waiver under section 107(e) of the Act.").

Directly relevant here is Subpart D of the implementing regulations, 25 C.F.R. § 900.14–.19, which governs, *inter alia*, "any proposal . . . to amend an existing self-determination contract."  *Id.* § 900.14.  Consistent with 25 U.S.C. § 450f, 25 C.F.R. § 900.16 provides:

> How long does the Secretary have to review and approve the proposal and award the contract, or decline a proposal?
>
> The Secretary has 90 days after receipt of a proposal to review and approve the proposal and award the contract or decline the proposal in compliance with section 102 of the Act and subpart E. At any time during the review period the Secretary may approve the proposal and award the requested contract.

The regulations, like the statute, permit the Secretary to obtain an extension to the 90-day deadline "with written consent of the Indian tribe or tribal organization.  If consent is not given, the 90–day deadline applies."  *Id.* § 900.17.  Moreover, "[a] proposal that is not declined within 90 days (or within any agreed extension under § 900.17) is deemed approved and the Secretary shall award the contract *or any amendment* or renewal within that 90–day period and *add to the contract the full amount of funds* pursuant to section 106(a) of the Act."  *Id.* § 900.18 (emphases added); *see also id.* § 900.21 ("When can a proposal be declined?  As explained in §§ 900.16 and 900.17, a proposal can only be declined within 90 days after the Secretary

receives the proposal, unless that period is extended with the voluntary and express written consent of the Indian tribe or tribal organization.").

### B.  The Effect of the Nation's Proposed Amendments

The Nation's argument is forceful in its simplicity, in its support in the undisputed evidence, and in its grounding in the unambiguous terms of the Contract, the statute, and the regulations.  "In the April 29 Proposal Letter, the Nation proposed in plain terms to amend the Nation's FY 2010 Agreement to increase funding by $3,774,392, plus interest . . . [and i]n the same letter, the Nation . . . proposed an identical amendment to the Nation's FY 2011 Agreement."  Pl. MSJ 9–10.  "The IHS Nashville Office received the April 29 Proposal Letter . . . on May 2, 2011 . . . [but t]he ninety (90) day period expired before August 3, 2011, without any response during that time by the Secretary or any other officer of the Department to the Nation's proposed amendments other than a May 4, 2011 e-mail acknowledging that '[w]e are in receipt of your [April 29 Proposal Letter] and have made assignments to provide you with a response as soon as possible.'"  *Id.* at 10 (quoting E-mail Chain at 6).  According to the Nation, its proposals thus automatically became part of the Contract under 25 U.S.C. § 450f(a)(2) and 25 C.F.R. § 900.18.  The ISDEAA states: "Subject to the provisions of [25 U.S.C § 450f(a)(4), governing severable portions of contract proposals], *the Secretary shall, within ninety days* after receipt of the proposal, *approve the proposal and award the contract unless* the Secretary provides written notification to the applicant" that one of five reasons for declination applies.  25 U.S.C. § 450f(a)(2) (emphases added); *see also* 25 C.F.R. § 900.16.  The regulatory text is equally unequivocal: "A proposal that is not declined within 90 days (or within any agreed extension under § 900.17) *is deemed approved* and the Secretary *shall award . . . any amendment* . . . and add to the contract the full amount of funds pursuant to section 106(a) of the Act."  25 C.F.R. § 900.18 (emphases added).  As noted above, the regulatory text automatically became

16

part of the Contract.  *See* 25 C.F.R. § 900.2(c).[6]  Because the Contract and all of these provisions

are clear, the Court finds that the Nation's April 29, 2011 Letter proposed amendments to the

Contract for FY 2010 and FY 2011 that became effective when the Secretary failed to respond

within 90 days.

        Seeking to avoid the consequences of IHS's failure to respond to the Nation, the

Secretary advances four arguments.  First, she asserts, "the April 29 Letter was not a proper

proposal to amend" because "the FY 2010 AFA had been fully performed well before the April

29 [L]etter was submitted."  Defs. MSJ at 10–12.  Second, according to the Secretary, the Letter

"was in substance a contract claim for additional funds," not an amendment proposal.  Defs. MSJ

at 10, 12–14.  Third, "even if the April 29 Letter were a proper proposal to amend, the Secretary

has met the requirements of the statute and regulations, which only require that [IHS] add the full

[Secretarial] amount to the agreements."  *Id.* at 10, 14–19.  Lastly, the Secretary argues that the

Nation "has failed to show that it is entitled to its claimed per-patient amount" because there is

"no evidentiary basis" for the amounts requested.  *Id.* at 10, 19–20.  Each argument misses the

mark.

        **1.   Whether the Amendment Proposal Was Not Proper Because the
            Time for Performance Had Lapsed**

        First, the Secretary argues, the April 29, 2011 Letter was not a proper proposal to

amend the Contract because "by the time the Nation sent the April 29 Letter to IHS, the FY 2010

contract and AFA had been fully paid and performed" because FY 2010 "ended on September

---

[6] The Court notes that the IHS "Internal Agency Procedures Handbook" states, in the section for
"Contract Amendment Proposals," that "[f]ailure of agency personnel to act within the 90-day
period precludes the agency from asserting a declination issue and results in the award of a
contract amendment, consistent with 25 C.F.R. § 900.18."  DOI/IHS Internal Agency Procedures
Workgroup, Handbook at 5-20, July 28, 1999, *available at*
http://www.bia.gov/cs/groups/xois/documents/collection/idc013271.pdf.

30, 2010." Defs. MSJ at 11–12 (citing, *inter alia*, Restatement (Second) of Contracts § 235); *see also* Defs. Reply [Dkt. 21] at 2–3 ("[T]he FY 2010 and FY 2011 contracts are clearly separate and distinct, with each having a limited performance period."). The Nation responds that the parties "could not have fully performed the [Nation's] underlying self-determination [C]ontract before the April 29 Proposal Letter because the [C]ontract is for an indefinite term." Pls. Reply [Dkt. 18] at 3 (citing Contract, Art. II § 1). Rather than being discrete annual contracts, in the Nation's view the AFAs are merely "successor amendments" to the Contract—i.e., side agreements as to how much money the Nation will receive to reimburse it for the health services it provides to its members in a given year, each of which becomes part of the larger, indefinite-term Contract. *Id.* at 3–5. The Nation also notes that the Secretary pays each year's funding in a lump sum, in advance, and that the funds become "no year" appropriations with no deadline for use once transferred. *Id.* at 4–5.

The Secretary's argument depends on two premises: first, that the AFAs are separate agreements that exist distinct from the Contract and, second, that the parties' time for mutual performance under the separate agreement (i.e., the FY 2010 AFA) had lapsed once she transferred the originally negotiated lump sum for FY 2010.[7] The first premise is fallacious because it runs contrary to the text and purpose of the parties' self-determination Contract. Like all self-determination contracts following the model agreement set forth in 25 U.S.C. § 450*l*(c), the Contract here is designed as an overarching document that defines the parties' relationship, while they negotiate annually the amount to be paid. The Contract states plainly that its term is "indefinite," with a "funding period . . . [to] be determined on the basis of a calendar year" or

---

[7] The Secretary fails to elucidate how her argument extends to FY 2011 given that, by her own definition, the FY 2011 AFA was not fully performed when the Nation proposed the amendment in April 2011. FY 2011 Claim Denial Letter at 5.

other agreed-upon period.[8]   Contract at 2.  "The total amount of funds to be paid under this

Contract, pursuant to Section 106(a) of the Act" is to be "determined in an Annual Funding

Agreement [AFA] entered into between the Secretary and the Contractor, which shall be

incorporated into this Contract."  Contract at 7.  Thus, the Nation and the Secretary entered into

the Contract in 2000 and agreed upon a procedure to negotiate payments for ensuing fiscal years.

This procedure is in keeping with the ISDEAA's directive that "[o]n an annual basis . . . the tribe

or tribal organization shall have the option to negotiate with the Secretary the amount of funds

that the tribe or tribal organization is entitled to receive under such contract pursuant to this

paragraph."  *Id.* § 450j-1(a)(3)(B).  Thus, under the Contract as agreed upon and performed by

the parties, the AFAs are not standalone agreements; they form part of the original Contract as

anticipated by the Parties and are subject to its terms.

        The Secretary's second premise—that the parties' time for mutual performance

lapsed once she transferred the originally negotiated lump sum for FY 2010—is also flawed.

The Secretary agrees that its Contract with the Nation is "indefinite," Contract at 2; by its term,

the time for performance had not lapsed.  Moreover, the Secretary's argument conflicts with the

reality of the contracting process.  The parties enter into AFAs before the fiscal year in question

concludes—for example, the FY 2010 AFA was countersigned on November 12, 2009, for a

fiscal year that began on October 1, 2009.  Thus, they enter into funding agreements by making

predictions about future costs.  It is completely logical to imagine a scenario like the one

presented here, in which one of the parties learns belatedly that one of its key presumptions at the

time of negotiation was materially flawed.  In order to have sufficient funding to cover all

healthcare costs actually incurred, that party asks the other to reform the contract.  While FY

---

[8] As stated above, the parties have agreed to new funding levels annually, originally using a
calendar year before switching to a fiscal-year system in 2004.

2010 had concluded when the Nation realized its error and proposed the amendment, that fact does not mean that the Nation had paid for all of its FY 2010 costs.  Indeed, as the United States's Medicare system shows, it is common in the healthcare field for institutions to receive prepayments and then process adjustments for years afterward.  Presumably, in the ordinary course of business, a less gross differential between predicted and actual costs for annual healthcare under the ISDEAA is absorbed by one party or the other, informing negotiations for future years.  But nothing in the contract precludes the Nation from doing what it did here, which was to *propose* that it receive more funding because there had been an error of substantial magnitude.  The Secretary had the contractual right to say "no" for 90 days; she cannot now complain about the consequences of failing to do so.

### 2.   Whether the April 29, 2011 Letter Was a "Claim" Instead of an "Amendment"

Second, the Secretary contends that the April 29, 2011 Letter was not a valid proposed amendment because it was merely a "claim" for additional funds deriving from the Nation's own erroneous user population count.  Defs. MSJ at 12–14; Defs. Reply at 4–5.  According to the Secretary, "the proper inquiry is ascertaining the substance of what the Nation proposed in its April 29 Letter," which she claims is "an attempt to make a post-award claim for additional funds to which it was not entitled under the ISDEAA."  Defs. Reply at 4.  She asserts that the ISDEAA distinguishes between a "true 'amendment'"—which must include a proposal to take on new programs or services—and a "mere supplement of funds to existing programs," which must be treated as a claim.  *Id.* at 4 (citing 25 U.S.C. § 450*l*(c)(e)(2)).  If the Secretary were correct, then the grievance raised by the Nation in this case would be properly considered a "claim" subject to the procedures of the Contract Disputes Act of 1978 ("CDA"), Pub. L. 95-563, 92 Stat. 2383, *codified at* 41 U.S.C. § 7101 *et seq.*  If the April 29, 2011 Letter were a

"claim" and not a proposed amendment, it would not be subject to 25 U.S.C. § 450f(a)(2) and 25

C.F.R. § 900.18, which make proposed "amendments" automatically effective after 90 days

without response.

       The first part of the Secretary's argument—that the April 29, 2011 Letter by its

plain text was a "claim" and not an "amendment"— is unfounded.  While the word "claim" does

appear in the document several times, the Nation's intent is unmistakable:

> Accordingly, pursuant to Pub. L. 93-638, as amended, we hereby *propose an amendment* to Seneca Nation's Contract # 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, for FY 2010 to increase Modification #71 by $3,774,392, plus interest, and *request that this amendment proposal be handled pursuant to 25 CFR 900, Subpart D.*

> Likewise, pursuant to Pub. L. 93-638, as amended, we hereby *propose an amendment* to Seneca Nation's Contract # 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, extended for FY 2011 to increase Modification #81 by $3,774,392, plus interest, and r*equest that this amendment proposal be handled pursuant to 25 CFR 900, Subpart D.* Both claims in *both amendment proposals . . . .*

April 29, 2011 Letter at 2–3 (emphases added).  This letter put IHS on notice that the Nation

intended to propose an amendment and believed that it was doing so; ordinary principles of good

faith dealing in contracts behooved the Secretary to notify the Nation in a timely manner that it

disagreed, rather than simply wait for the 90-day period to expire.

       The Secretary's argument thus becomes that, contrary to the Nation's intent, the

April 29, 2011 Letter must be treated as a "claim."  The Secretary cites 25 U.S.C. § 450m-1(d)

and Subpart N of the ISDEAA implementing regulations, 25 C.F.R. §§ 900.215–.230, to support

her argument.  The statutory provision, 25 U.S.C. § 450m-1(d), provides simply that "Chapter 71

of Title 41 [i.e., the CDA] shall apply to self-determination contracts."  Subpart N, governing

"Post-Award Contract Disputes," "covers [a]ll HHS and DOI self-determination contracts,

including construction contracts; and [a]ll disputes regarding an awarding official's decision

relating to a self-determination contract." 25 C.F.R. § 900.215.  The CDA and Subpart N require

government contractors to submit claims to a contracting officer for a ruling and to follow

special requirements on claims greater than $100,000, including submitting a special

certification.  *See* 41 U.S.C. § 7103(b), 25 C.F.R. §§ 900.219–.220.  The Secretary also notes the

definition in 25 C.F.R. § 900.218: "A claim is a written demand by one of the contracting parties,

asking for . . . [a]djustment or interpretation of contract terms."  25 C.F.R. § 900.218.

> The regulatory provisions and the Contract contravene the Secretary's argument.

The "Modifications and Amendments" section of the Contract, Article V Section 2—which

again parrots the model agreement set forth in the text of the ISDEAA—states:

> (A) IN GENERAL-Except as provided in Article V, Section 2(B)
> of this Contract, no modification to this Contract shall take effect
> unless such modification is made in the form of a written
> amendment to this Contract, and the Contractor and the Secretary
> provide written consent for modification.

> (B) EXCEPTION-The addition of supplemental funds for
> programs, services, functions and activities (or portions thereof)
> already included in the Annual Funding Agreement under Article
> VII, Section 2 of this Contract, or the reduction of funds pursuant
> to Section 106(b)(2) of the Act, shall not be subject to Article V,
> Section 2(A) above.

Contract at 9.  This provision is even more permissive in its treatment of requests for additions of

supplemental funds—such proposed modifications *may* take the form of a written amendment,

but they need not do so.  The language indicates and carries out the intent of Congress in

enacting the ISDEAA, which states that funds "may, at the request of the tribal organization, be

increased by the Secretary if necessary to carry out [the ISDEAA]," 25 U.S.C. § 450j-1(b)(5),

and that the Secretary is not permitted to "revise or amend a self-determination contract with a

tribal organization without the tribal organization's consent," *id.* § 450m-1(b).

While the Secretary correctly quotes the text of 25 C.F.R. § 900.218, which defines a "claim" as a request for "[a]djustment or interpretation of contract terms," that provision cannot trump the direct provisions in the Contract and the ISDEAA that specifically contemplate proposed amendments for an increase in funding.[9]  Moreover, the Secretary's reading contravenes the common understanding of the terms "amendment" and "claim."  The former reflects a *change* to the terms of the parties' agreement, while a "claim" refers to a demand to something that rightfully belongs to a party *pursuant to* an existing agreement.  *See* Black's Law Dictionary (9th ed. 2009) (defining "amendment" as "[a] formal revision or addition proposed or made to . . . [an] instrument; specif., a change made by addition, deletion, or correction; esp., an alteration in wording" and defining "claim" as "[t]he assertion of an existing right; any right to payment or to an equitable remedy, even if contingent or provisional" or "[a] demand for money, property, or a legal remedy to which one asserts a right").  The Nation's April 29, 2011 Letter cannot be fairly characterized as a claim as opposed to an amendment; the Nation acknowledged at that time, and acknowledges now, that the agreement it originally struck as to FY 2010 and FY 2011 was different, to the tune of $7.4 million, from the agreement it asked the Secretary to consider on April 29, 2011.  If the Secretary wished to take the position that the April 29, 2011 Letter was a "claim" and not a proper amendment proposal to

---

[9] Moreover, the regulatory text implies that a "claim" does not encompass proposed amendments implicating additional funding for self-determination contracts.  Subpart N of the regulations, which incorporates the CDA language and requires special procedures for submission of a claim, states that it "does not cover the decisions of an awarding official that are covered under subpart L."  25 C.F.R. § 900.215(b).  The first part of Subpart L, which governs "appeals other than emergency reassumption and suspension, withholding, or delay in payment," specifically provides for appeal of "[a] decision to decline a proposed amendment to a self-determination contract, or a portion thereof, under section 102 of the ISDEAA."  25 C.F.R. § 900.150(c).  These provisions, read in tandem, further suggest that the ISDEAA and its regulations draw a distinction between a "claim" for a benefit not received under a contract and an "amendment" seeking to change the terms of that contract.

be treated "pursuant to 25 CFR 900, Subpart D" as requested in the April 29, 2011 Letter, she

should have done so within the statutorily provided 90 days.

### 3. Whether the ISDEAA Prohibits the Secretary from Increasing the Nation's Funding

The Secretary's third argument is that IHS "fulfilled its statutory duty by paying

the Nation the total amount required under section 106(a) of the ISDEAA [25 U.S.C. § 450j-

1(a)] and 25 C.F.R. § 900.18" by using her "discretion to establish the amount of funds spent on

the programs it is operating before the programs are transferred under the contract."  Defs. MSJ

at 14, Defs. Reply at 5.  She claims that "[t]he ISDEAA and regulations require nothing more,

regardless of whether the April 29 Letter could be construed as a deemed-approved amendment."

Defs. Reply at 5.  In advancing this argument—which can be charitably characterized as

tentative and opaque—the Secretary vacillates between suggesting that she is promulgating an

interpretation of § 900.18 in her summary judgment brief that is deserving of *Chevron* deference,

Defs. MSJ at 15–17, and arguing that the Nation is unfairly trying to garner a "windfall" at the

expense of other tribes due to a "procedural technicality," *id.* at 18.

The essence of the Secretary's third argument is stated most clearly on page 18 of

her summary judgment brief: "[O]nce IHS has defined the Secretarial amount [under 25 U.S.C.

§ 450j-1(a)] available to a tribe, applying the same methodology for each tribe, and contracted

with that tribe based on that premise, it is not authorized to provide some other category and alter

that contractual promise, absent limited circumstances prescribed by statute."  Defs. MSJ at 18.

The Nation rejoins that it "does not assert that it is entitled to an amount in excess of the Section

106(a) Secretarial amount[; r]ather, [the Nation] submitted requests for additional funding to the

Secretary in the form of proposed amendments to its contract to increase the Section 106(a)

Secretarial amount to which it is entitled."  Pls. Reply at 9.

24

The ISDEAA firmly supports the Nation's position.  The Nation's proposed amendment sought the Secretary's agreement to *increase* the amount of funds it received under 25 U.S.C. § 450j-1(a)—that is, its "Section 106(a)" or "Secretarial" amount.  *See* April 29, 2011 Letter at 2–3.  As noted above, the ISDEAA does not state that the Secretarial amount becomes immutable once agreed upon for a given year; instead, it explicitly contemplates that self-determination contract funds "may, at the request of the tribal organization, be increased by the Secretary if necessary to carry out [the ISDEAA]."  25 U.S.C. § 450j-1(b)(5).  Moreover, the very reason put forth by the Secretary now—that "the amount of funds proposed under the contract [amendment] is in excess of the applicable funding level for the contract, as determined under [25 U.S.C. § 450j-1(a)]"—is one of the five reasons listed in the ISDEAA that can justify the Secretary's refusal to agree to "a proposal to amend . . . a self-determination contract."  *Id.* § 450f(a)(2)(D).  The Secretary's argument that she was not obligated to give a timely response of the precise type of response articulated by the statute is unpersuasive.

The next position advocated by the Secretary—that, even if the amendment were effective, she is statutorily prohibited from adding these funds once the Secretarial amount is set—fails for several reasons.  First, as discussed above, 25 U.S.C. § 450j-1(b)(5) explicitly contemplates that the Secretary may increase the Secretarial amount.  Second, her suggestion that she has exhausted her statutory responsibilities by using her "discretion to establish the amount of funds spent on the programs it is operating before the programs [were] transferred" to the Nation's control, Defs. Reply at 5, ignores the contractual nature of the relationship between the Nation and IHS, who agreed to the Contract and to negotiate funding levels for each fiscal year.  The Secretary and the Nation's relationship is governed by the Contract and by the provisions of the ISDEAA, the latter of which specifies that proposed amendments automatically

become part of the Contract if the Secretary fails to respond in a timely manner.  The Contract

and the statute do not preserve any place for the Secretary's discretionary authority to determine

funding levels *post facto* of her failure to carry out a non-discretionary obligation to respond

within 90 days or face the consequences of not doing so.

      To the extent that the Secretary argues that the payment of approximately $7.4

million to the Nation is a financial impossibility and would permit the Nation to gain a financial

windfall at the expense of other Indian tribes, the Secretary impermissibly invites the Court to

meddle with her contracts and "render [her] promises nonbinding."  *Cherokee Nation*, 543 U.S.

at 641.  A very similar argument was rejected by the Supreme Court in *Cherokee Nation*, in

which the government argued that 25 U.S.C. § 450j-(a)(1) was "an affirmative grant of authority

to the Secretary to adjust funding levels based on appropriations."  *Id.* at 643–44 (citation to

government brief omitted).  The Supreme Court held that when a federal agency promises to

make payment to a tribe under a self-determination contract, the agency is obligated to make the

payment even if doing so would require diversion of funds from other tribes if sufficient

unrestricted appropriations remain, notwithstanding the language in 25 U.S.C. § 450j-1(b) that

"the Secretary is not required to reduce funding for programs, projects, or activities serving a

tribe to make funds available to another tribe or tribal organization."  *See* 543 U.S. at 642

("[A]gencies may sometimes find that they must spend unrestricted appropriated funds to satisfy

needs they believe more important than fulfilling a contractual obligation.  But the law normally

expects the Government to avoid such situations . . . .").  While not precisely on point, *Cherokee

Nation* at least stands for the proposition that, subject to sufficient unrestricted appropriations,

the Secretary may not use § 450j-1(b) as a shield to avoid her contractual obligations.  543 U.S.

at 643–44.

### 4.  Whether the Nation's Per-Patient Amount Is Appropriate

Finally, the Secretary argues that the Nation "has not demonstrated that it is entitled to a per-patient amount of $1,855.65" because the Nation "cites an arbitrary per-person cost of providing healthcare and applies it to the patients it alleges were undercounted." Defs. Reply at 10.  Because "IHS does not fund ISDEAA contracts on a per-person basis" and because "the Nation has not provided evidence that this precise figure was ever proposed by IHS in any scenario" and has not "shown that IHS ever conclusively determined a per-patient cost of healthcare for the Nation," the Secretary argues that the Nation is not entitled to the proposed payments.  Defs. Reply at 11.  The Secretary relies on the Declaration of Cliff N. Wiggins, Senior Operations Research Analyst for IHS in its Rockville, MD Headquarters.  Mr. Wiggins states that "[e]ven if IHS reinstated 2,034 persons erroneously omitted by the Seneca Nation of Indians (Nation or Tribe) in its FY 2010 user population count, HQ would not increase base funding levels because they do not fluctuate with user population counts and were not reduced when the users were omitted."  Wiggins Decl., Defs. MSJ Ex. [Dkt. 15-3] at 11–15, ¶ 12.

First, the Secretary fundamentally misunderstands the burden placed on her by the statute.  The Secretary bears the burden of "clearly demonstrating the validity of the grounds for declining [a] contract proposal (or portion thereof)," 25 U.S.C. § 450f(e)(1); it is not the Nation's burden to justify the validity of its position.  As set forth above, IHS failed to respond to the proposed amendments within the required time, and the Secretary has not shown that it was justified in doing so.

Moreover, questioning the validity of the Nation's per-person amount is not a proper task for the Court at this juncture.  The Secretary invites the Court to evaluate the bargain the parties have struck through their Contract and operation of law, but that is a matter properly addressed through contract negotiations or through declination of the proposed amendment

pursuant to 25 U.S.C. § 450f(a)(2) if the Secretary truly believed the amount was unsupported. The Court also notes that the amount proposed by the Nation appears facially reasonable because even if IHS does not traditionally calculate funding on a per-person basis, the Nation has explained that it selected a formula to remedy its perceived funding gap by picking a comparatively low per-capita figure from the five formulas given to it as examples by IHS representatives, including Mr. Wiggins. *See* April 29, 2011 Letter at 2–3 (explaining that the Nation used $1,855.65 per person times 2,034 persons, although the highest formula rate was $3,344 per person).

The Court finds that the relevant provisions of the ISDEAA and its implementing regulations are clear and that none of the arguments offered by the Secretary is sufficient to muddy the waters. When the Secretary fails to respond to an amendment proposal to a self-determination contract within the allotted 90 days, the proposal automatically becomes part of the parties' Contract. *See* 25 U.S.C. § 450f(a)(2), 25 C.F.R. § 900.18. While this system may seem imbalanced, Congress designed self-determination contracts to work in this manner for a specific remedial purpose, and the ISDEAA, its regulations, and the resulting contracts between Indian tribes and the United States must be read with that remedial intent in mind. By ignoring her deadline, the Secretary became bound to the proposed Contract amendments.

## IV.  CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Summary Judgment on Counts I, II, and III, Dkt. 14, will be granted, and Defendants' Cross-Motion for Summary Judgment, Dkt. 15, will be denied. A memorializing Order accompanies this Opinion.

DATE: May 23, 2013

_____/s/_____

ROSEMARY M. COLLYER
United States District Judge
